Opinion delivered May 25, 1886.

[No. 4073.]

## SILAS AYRES *v.* THE STATE.

1. CHARGE OF THE COURT.—ALIBI is a defense which, ordinarily, is sufficiently embraced in the general charge of the court that the accused is presumed innocent until his guilt is established by competent evidence beyond a reasonable doubt. It is not, usually, necessary that the trial court should charge specially on such defense, unless requested to do so. But the rule obtains in this State that if the *only* defense is an alibi, the trial court should charge the law relating thereto; and if an appropriate charge upon the subject has been requested and refused, or an exception has been reserved because of the omission of a proper instruction thereon, the judgment of conviction will be reversed if the facts of the case made a charge upon alibi applicable.

2. SAME.—In this case the trial court charged the jury as follows: "Where the defendant relies upon proof of an alibi, that is, proof that he was at some other place at the time the offense (if any) was committed, the burden of proof as to that fact is on the defendant, and he is required to establish it by a preponderance of evidence; but if the evidence adduced

raises a reasonable doubt in the minds of the jury, the defendant is entitled to the benefit of the doubt." *Held*, erroneous, because alibi merely traverses the issues tendered in the indictment, and is not a special defense, nor, in its nature, an independent exculpatory fact, and, therefore, the burden of proof is not upon the accused to establish it. Under the facts of this case, the charge was such error as to injure the rights of the accused, and such as could be mooted for the first time in the motion for new trial.

3. SAME.—POSSESSION OF RECENTLY STOLEN PROPERTY, if such possession be unexplained, is prima facie evidence of theft, such as will authorize the inference or presumption of guilt, but such inference or presumption is not a mere legal one, but is one of fact to be found by the jury. The trial court should, in no instance, charge the conclusiveness of such inference and presumption, but should submit them as facts to be found by the jury, for, at most, they are but circumstances from which guilt is inferred, and not positive proof establishing it. Under this rule, the trial court erred in charging in this case that "the possession of property recently stolen, when the possession is unexplained, is an evidence of theft," etc.

APPEAL from the District Court of Washington. Tried below before the Hon. I. B. McFarland.

The conviction in this case was for the burglary of the house of Glenn Ford and C. Lively, alias C. Washington, in Washington county, Texas, on the fifteenth day of July, 1885, with intent to commit theft. The penalty imposed by the jury was a term of two years in the penitentiary.

Glenn Ford was the first witness for the State. He testified that he and Chancy Lively, during the month of July, 1885, lived in the same house, in the town of Brenham, Washington county, Texas. They went to a concert together on the night of the fifteenth day of that month. The concert was rendered by a blind man, in the Baptist church, about a half a mile from their house. They left home a little after eight o'clock, leaving their four children, the oldest seven or eight years old, and the youngest an infant about three months old, at the house. They returned from the concert between ten and eleven o'clock, and missed several articles from the house, including a clock, a pillow case, some lard, some butter, a sack of flour, and some finger rings. Chancy Lively owned the clock, finger rings, and pillow case, and the witness owned the flour, butter, and lard. Witness sold the clock to Chancy, he having previously purchased the same from a peddler, for seven dollars and fifty cents. Witness and Chancy left all the doors of the house locked, with

the keys in witness's pocket. The window of Chancy's room was down, but unfastened, when they started to the concert. They found the doors and the window, on their return, just as they left them, but found some flour on the window sill, on a box under the window, and on the ground outside under the window, and the tracks of a man and a boy leading to the window, showed that the house was entered through the window. On the morning after the burglary the witness traced the tracks of the boy up to the window, and the tracks of the man to a point about twenty feet distant from the window. The tracks of the two persons came to the house together, but, leaving, they went off in different directions. The three older children were left in Chancy's room. The defendant lived between the witness's house and the Baptist church at which the concert was given. Some five or six weeks after the burglary, the witness found the clock at the house of a Polander, through information given him by his brother-in-law, who worked for the Polander. He knew the clock by marks he had made on the back and face with his knife, and by white wash stains on the frame. The house was entered and the property taken without the knowledge or consent of the witness.

Chancy Lively testified, for the State, substantially as did the witness Ford, except that she had no personal knowledge of where or from whom Ford recovered the clock. He recovered it, however, and the witness knew it to be the identical clock taken with the other articles from her house. Witness was known by the names of Chancy Lively and Chancy Washington. No one had her consent to enter the house or remove the articles. The burglary was perpetrated on a Wednesday night.

Mike Falk testified, for the State, that he lived on the Richard's place, about two and a half miles from Brenham. His father and mother lived about two hundred yards from him on the same place. Some time subsequent to the alleged burglary, Glenn Ford came to witness's house and claimed a certain clock which witness then had. Prior to that time a negro named Pulmore asked witness where he got that clock, and claimed to know the rightful owner. The clock was then the property of the witness's mother, who had loaned it to him to give medicine by to a sick child. The witness's mother got that clock from the defendant, paying him one dollar and seventy-five cents for it. Witness was present in the field when defendant sold the clock to his, witness's, mother, and went with them from the field to

the house, where the money was paid to defendant by witness's mother, in witness's presence. This transaction occurred on Thursday, about the middle of July, 1885. Ford claimed the clock about four weeks after witness's mother purchased it. The witness never saw the defendant before he sold the clock to his mother. Defendant gave no name at that time, but said he had a brother working for Fisher & Weis. Witness next saw the defendant, and recognized him as the man who sold the clock, on the streets of Brenham, a short time before his arrest. Glenn Ford did not point the defendant out to the witness during the examining trial, and witness did not say, in the hearing of any one, just before he took the stand on the examining trial, that he would not have known the defendant had not Glenn Ford pointed him out. The witness did not know Dave Vaughan.

Adam Falk, the last witness's brother, testified, for the State, in substance, that on Thursday, about the middle of July, 1885, the defendant came to his father's house and offered to sell the clock afterwards recovered by Glenn Ford, for three dollars. Witness's father declined to buy it, and defendant went off. He returned again late on the evening of the same day, to where witness and the other members of the family were at work in the field, and offered to sell it for two dollars. Witness's mother offered him one dollar and seventy-five cents for it. He sold it for that amount, seventy-five cents being reserved to pay him on the delivery of the key. He brought the key about a week later, when witness paid him the seventy-five cents. Witness next saw him at the examining trial.

Mary Ann Falk, the mother of Mike and Adam Falk, testifying for the State, detailed the transaction with the defendant substantially as did her son Adam. She identified the defendant as the man who sold her the clock. Stephen Falk, Mary Anna's husband, testifying for the State, identified the defendant as the man who sold the clock to his wife.

Justice of the peace Hackworth testified, for the State, that he presided over the examining trial of the defendant. Mike and Adam Falk were witnesses on that trial, and identified the defendant as the man who sold the clock to their mother. They pointed him out among a number of negroes of about his age and color, whom the witness had bunched in the court house. The State closed.

Joseph Ralston, Jr., was the first witness for the defense. The substance of his testimony was that he lived near Brenham

in July, 1885.   Defendant, his father and another colored man, worked on a well for the witness on Wednesday, July 15, 1885, the day of the night on which the burglary is alleged to have been committed, and again on Thursday, July 16, 1885, the day on which it was claimed the defendant sold the clock to Mrs. Falk.   Witness knew, as an absolute fact, that the defendant was not away from the well on his, witness's, place, from early morning until very late in the evening on the said Thursday, July 16, 1885.

David Ayres, the defendant's father, testified, in his behalf, substantially as did the witness Ralston, and, in addition, that defendant went directly home with him from Ralston's on the evening of Thursday, July 16, 1885.   Glenn Ford lived about three-quarters of a mile south of the Baptist church, and in going to that church from home, would pass witness's house, which he did, as witness knew, on the Wednesday night that the blind man gave a concert at that church.   Defendant and one Maultie Lewis left witness's house together to go to that concert.   They started from witness's house before Ford passed it, and went towards the Baptist church.   Ford passed witness's house, on his way home from the concert, after twelve o'clock.   Witness knew that ill feeling existed between defendant and Glenn Ford prior to the alleged burglary.

Maultie Lewis testified, for the State, that the defendant came to his house about sun down, on the evening of Wednesday, July 15, 1885.   Witness went with him to his house, where defendant got his coat, and the two went on towards the church.   They left defendant's father's house between seven and eight o'clock. Defendant stopped at the house of his sister-in-law, near the church, and witness went on to the church.

Rachael Evans testified, for the defense, that she had a sister named Sallie McQueen living with her.   Defendant came to witness's house on the night of Wednesday, July 15, 1885, and he and Sallie left the house to go to the concert.   They left between seven and eight o'clock, and returned between eleven and twelve, after which the defendant remained at witness's house with Sallie about thirty minutes.   Witness did not know whether defendant and Sallie went to the concert or not, but they left her house for that purpose.

Sallie McQueen testified, for the defense, that the defendant took her to the concert on the night of the alleged burglary. They left Rachael Evans's house about eight o'clock, and went

direct to the church. Defendant escorted witness into the church, secured her a seat, and retired outside of the church, as he could not procure a seat for himself. After the concert, which closed at about eleven o'clock, defendant escorted witness home, and remained with her about thirty minutes.

Sellers Toland, Dan Stevenson, and Allen Ayres testified, for the defense, that they attended the concert on Wednesday night, July 15, 1885. Defendant escorted Sallie McQueen to the concert, found her a seat in the church, and joined the witnesses and others outside of the church, and was not out of their sight five minutes at any one time until the concert broke up at eleven o'clock, when he went off with Sallie McQueen towards Rachael Evans's house.

Dave Vaughan testified, for the defense, that during the progress of the examining trial of the defendant, the State's witness Mike Falk, told him that he would not have known the defendant as the man who sold the clock if Glenn Ford had not pointed him out.

The motion for new trial raised the questions discussed in the opinion.

*E. B. Randle*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. In the eighth paragraph of the charge the jury were instructed that "where the defendant relies upon proof of an alibi, that is proof that he was at some other place at the time the offense (if any) was committed, the burden of proof as to that fact is on the defendant, and he is required to establish it by a preponderance of evidence; but, if the evidence adduced raises a reasonable doubt in the minds of the jury, the defendant is entitled to the benefit of the doubt." This charge was not excepted to, but in the motion for a new trial it is claimed that it injured the rights of defendant. A similar charge by the same judge in Johnson v. The State, *ante* page 368, was held fatally defective.

Unless requested to do so, the trial judge is not required to charge specially upon the defense of alibi. It is ordinarily a defense sufficiently embraced in the general charge that a defendant is by law presumed innocent until his guilt is established by competent evidence beyond a reasonable doubt. (Davis v.

The State, 14 Texas Ct. App., 645; McAfee v. The State, 17 Texas Ct. App., 131.) In The State v. Reed, 62 Iowa, 40, it is held that alibi is not a *defense* within the accurate meaning of that word, but a mere fact shown in rebuttal of the State's evidence, and it does not, therefore, demand a specific instruction from the court. With us the practice has been, where *the only* defense shown is an alibi, to recognize the propriety of a charge upon the law relating to such evidence. (Willson's Crim. Forms, Nos. 712, 713, p. 333, and note; Hunnicutt v. The State, 18 Texas Ct. App., 500), and where an appropriate charge upon the subject has been requested and refused, or an exception has been taken to a charge for omission in this respect, such objections have invariably been held sufficient grounds for reversal if the facts of the case made such a charge applicable. In the case before us the defensive evidence mainly went to establish an alibi.

The charge of the court was unquestionably erroneous. The burden of proof is not upon a defendant in a criminal case to establish an alibi by a preponderance of evidence, if that is one of his defenses relied upon. Such defense is not a special one, nor is it in its nature an independent exculpatory fact. "If the evidence of an alibi produces upon the minds of the jury a reasonable doubt concerning the truth of the facts constituting the guilt of the defendant affirmed in the indictment, it would be sufficient to require an acquittal. Such a doubt might arise in the minds of the jury from the evidence tending to prove the alibi, and if so, that would be sufficient to render the evidence available to rebut the affirmative evidence for the State, without their minds ever having arrived at a conviction to the degree of a moral certainty as to the truth of the alibi." (Walker v. The State, 42 Texas, 360.)

Again: "When no special plea or independent exculpatory fact is relied on by the accused, and he confines his defense to a traverse of the issues tendered in the indictment, the burden of proof never devolves upon him." (Dubose v. The State, 10 Texas Ct. App., 231, and authority cited; Jones v. The State, 13 Texas Ct. App., 1; Thomas v. The State, 14 Texas Ct. App., 200.) We are of opinion the instruction as given, and under the circumstances shown by the evidence, was calculated injuriously to affect the rights of the defendant, and that the error could be availed of on a motion for new trial. (Johnson v. The State, *ante* p. 368.)

None of the stolen goods were found in possession of defend-

ant. A clock which was taken at the time of the burglary was found in the house of one Mike Falk some weeks after the crime was committed, and which clock Falk claimed to have bought of defendant. In the seventh paragraph of the charge the jury were instructed that "the possession of property recently stolen, when the possession is unexplained, is an evidence of guilt," etc. This was error. Whilst it is true, as a legal proposition, that *unexplained* possession of property recently stolen is prima facie evidence of theft, and whilst the law would from such circumstances authorize an inference and presumption of guilt, such an inference and presumption is not a mere legal one but is one of fact to be found by the jury. And the court should, in no instance, charge the conclusiveness of such presumption or inference, but should submit them as facts to be found by the jury, for, at most, they are but circumstances only from which guilt is inferred, and not positive proof establishing it. (Thomas v. The State, 43 Texas, 658; Perry v. The State, 41 Texas, 483; Faulkner v. The State, 15 Texas Ct. App., 115; Lehman v. The State, 18 Texas Ct. App., 174; Schultz v. The State, 20 Texas Ct. App., 309.)

For errors in the charge of the court, the judgment is reversed and the cause remanded.

*Reversed and remanded.*